In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

## NO. 09-22-00197-CV
_____

## IN THE INTEREST OF D.E.T.

**On Appeal from the 75th Judicial District Court
(Assigned to the County Court at Law No. 2)
Liberty County, Texas
Trial Cause No. CV1610614**

## MEMORANDUM OPINION

This is an appeal from a "Suit Affecting the Parent-Child Relationship"

(hereinafter "SAPCR").[1] After a bench trial, "Megan" appeals a modification order

---

[1] The original case was filed in the 75th Judicial District Court in Liberty County, Texas, and later assigned to County Court at Law No. 2 by the 75th Judicial District Court. The County Court at Law No. 2 explained on the record that the request for modification was assigned to County Court at Law No. 2 on August 24, 2020. *See Ward v. Ward*, No. 09-17-00024-CV, 2017 Tex. App. LEXIS 11385, at **10-14 (Tex. App.—Beaumont Dec. 7, 2017, pet. denied) (mem. op.) (concluding that an order by a district court assigning a case to a statutory county court at law was a proper assignment of the case) (citing *In re Nash*, 13 S.W.3d 894, 896-97 (Tex. App.—Beaumont 2000, orig. proceeding)).

1

("the Order") entered by the trial court with respect to her daughter "Darla."[2] The Order granted Darla's father "David" the exclusive right to designate Darla's primary residence within Liberty County and ordered Megan to pay child support. Megan appeals the Order, raising three issues. We affirm.

Background

Megan and David's Final Decree of Divorce was rendered November 21, 2016, and signed on January 12, 2017. In March 2018 the Judge of the 75th Judicial District Court signed a Reformed Final Decree of Divorce ("Reformed Decree"). In the Reformed Decree Megan was granted the exclusive right to designate the residence of Megan and David's child, Darla, without geographic restriction.

David filed a Request for Emergency Hearing, First Amended Counter Petition to Modify a Prior Order and Notice of Emergency Hearing on August 25, 2020. Therein he alleged that circumstances had materially and substantially changed since the date of the Reformed Decree. He alleged that he had sustained injuries in a work-related accident, and he requested modification of his child support. He also alleged that he had learned that Megan was moving to Brownsville and that the relocation was not in Darla's best interest. David asked the court to impose a geographic restriction on Darla's residence and to name David the

_____

[2] To protect the privacy of the parties, we use pseudonyms for the parties, witnesses, and the children. *See* Tex. Fam. Code Ann. § 109.002(d).

2

conservator with the exclusive right to establish Darla's residence. David attached his Affidavit to his First Amended Counter Petition to Modify a Prior Order. Therein, he made the following allegations:

- David learned that Megan planned to move to South Texas from a "third party" without notifying him in advance.
- David learned of Darla's extracurricular activities through third parties.
- Megan has "never been able to provide [Darla] with a stable home life."
- David and Megan's marriage ended when Megan became involved with another man, she and Darla lived with that man for about three years, and then Megan became involved with a second man.
- Megan told Darla not to tell the first man that she and Darla were staying at the home of the second man.
- Megan lacks financial responsibility, and she had often been late paying Father on a note for property she was awarded in their divorce.
- Megan's poor record of payment damaged David's credit, and David lost financing for a home he had hoped to buy.
- When Megan has possession of Darla, she often leaves Darla in the care of boyfriends and other relatives.
- School officials reported that Megan is difficult to reach and fails to return required school materials timely.
- School officials noted "a decrease in [Darla's] readiness to school" when she returns from Megan's possession.
- All of Darla's extended family live in Liberty County.
- A move to South Texas would significantly impair Darla's physical health or emotional development.
- It was in Darla's best interest for David to have the right to determine Darla's residence and for her residence to be restricted to Liberty County.

Megan then filed a Petition to Modify Parent-Child Relationship on November 6, 2020. In her Petition, she alleged that circumstances had materially and

3

substantially changed since the date of the Reformed Decree, she alleged the requested modification was in the child's best interest, and she sought an increase in child support payments to be paid by David.

David filed a Request for Emergency Hearing in December 2020, again seeking to modify the Reformed Decree. David alleged that, after the divorce, he was seriously injured in a work-related accident, that he had undergone a series of surgeries, that he had a reduced income, and that his return to full employment was undetermined. He also alleged that he learned through a third party that Megan was moving to Brownsville or Harlingen, and that relocation of the couple's child Darla—then six years old—was not in the child's best interest. David asserted that the child was then enrolled in elementary school in Liberty County and that relocation to Harlingen or Brownsville would significantly impair her physical health or emotional development and was not in the child's best interest. David asked the court to modify the prior order and impose a geographic restriction on the child's residence and to name David as the conservator with equal periods of possession and with the exclusive right to establish the child's residence. He also asked the court to "render appropriate orders to allocate his increased expenses on a fair and equitable basis because of the relocation of [Megan]." David also attached his affidavit to his Second Amended Counter Petition to Modify a Prior Order.

4

The parties tried the matter to the bench on July 30, 2021, and January 6 and 7, 2022. At trial, David's attorney told the court that David "either wants the restriction that she, the child, lives in Liberty County or that [David] be given the right to establish the residency of the child and [] both [parents] continue as joint managing conservators." At the time of trial, Darla was six-and-a-half years old.

Evidence at Trial

David's Testimony

David testified that he lives in Dayton, Texas (in Liberty County) with his new wife "Hannah," and he works six days a week at a ranch. According to David, when his daughter Darla lived in Liberty County, he would visit her at school, go to the movies, go fishing, dance, and he was involved with her participation in T-ball and various "daddy/daughter" functions. Photographs of David and Darla were admitted into evidence that David testified depicted him with Darla after the divorce. These photographs depict David and Darla at "Donuts with DAD[,]" doing homework, at a ranch, at Sea World, going fishing, in Fredericksburg, at the San Antonio River Walk, Darla with her pony, and Darla and Hannah "doing facials[.]" According to David, because Darla had moved to Brownsville, David no longer was able to visit her at school, take her to school or pick her up, his participation with her extracurricular activities was limited, and he no longer had Darla for overnights on Thursday or Sunday.

5

David testified that Megan did not notify him before she moved to Brownsville, and he found out through a third party. He also testified that he had difficulty getting Darla's school records in Brownsville because the school did not have a copy of the divorce decree nor his contact number, so he drove to Brownville to take the decree and provide his phone number. He further testified that he was not listed as a contact with Darla's doctor, and he obtained Darla's doctor's name by looking at a prescription medication bottle. According to David, it had been a continuing problem to get Megan to cooperate with him about Darla's doctors and schools. In David's opinion the schools in Liberty County were better because they are smaller and "can do more one-on-one with the children."

David testified that he and his new wife, Hannah, have family in Liberty County, and Darla has no relatives in Brownsville except for Megan and Megan's new husband. He also testified that it is a six-and-a-half-hour drive to Brownsville and that, when he has visitation with Darla, he does not have her for forty-eight hours because "drive time interferes with it." David agreed that he had suggested he and Megan hand off Darla for visitations in Refugio, halfway between Liberty County and Brownsville, and Megan had agreed. He further testified that he has incurred extra expense traveling back and forth because of the distance to Brownsville. According to David, Megan did not timely make payments on the loan she was ordered to pay in the divorce decree, and that David's credit had "taken a hit[]" as a

6

result. David agreed that he filed a motion requesting a geographic restriction to keep his daughter in Liberty County. David also agreed that he wanted Darla returned to the school district in Liberty County.

Megan's Testimony

Megan, Darla's mother, testified that she had been living in Brownsville for about two years with her husband Micah, her daughter Darla, her son Cyrus, who is two years older than Darla, and her infant son Dorian. Megan testified that she works from home as an interviewing specialist, and she lives in a three-bedroom brick home that she bought in November 2020. According to Megan, she is the sole caregiver, but her husband helps with the children, he cooks dinner, he plays with the children, and he teaches them how to do things like riding bicycles. Megan also testified that she was working on a bachelor's degree online in human resources that she expected to complete next year, and she has been accepted into a master's program.

Megan explained that the reason Darla missed school for a trip to Disney World was because David gets Darla for forty-five days during the summer, which meant Megan's family was "unable to take any kind of [] vacation or extended vacation because of that, so [they] had to do it in September." According to Megan, the absence from school did not affect Darla's school work, and Darla is a "straight A student." Megan testified that Darla has "a ton" of friends at her school and more

friends in the neighborhood in Brownsville. Megan also testified that she was in the PTO, had been involved in fund raisers, and she was asked to be on the campus improvement committee at Darla's current school.

Megan agreed that one time she drove to Refugio so David could pick up Darla for his visitation, and David did not show up, although Megan believed David knew it was "his weekend[.]" She agreed she had not been informing David of school activities, and she stated "It's not my job to inform him. He has the same access that I do[,]" and Megan said she gives David school information when he requests it. According to Megan, David does not come to pick up Darla on Fridays, but rather Hannah picks up Darla. Megan testified that Darla does not seem to have any issues with the visitation schedule and drive, and Megan testified she has given David additional hours on occasion.

Megan recalled that initially David was paying about $500 a month for child support, which was reduced to "three something[]" after he had a work-related accident and based on his income. Megan testified that expenses for Darla have increased because of the need for school supplies, new clothes, and "substantially[]" higher costs of housing. Megan testified that Darla is involved in ballet, tap, and jazz in Brownsville, and she planned to take karate.

According to Megan, when she was in Liberty County, she lived in a camper trailer on a ranch that she owned, and at one point, she got behind on paying a land

note due to illness and being laid off. Megan testified that, if she was required to move back to Liberty County, she would have to move back into her camper and "[i]t would be a bad thing." She also testified that her husband works for Space X, and if she had to move back to Liberty County, he could not be able to continue in that job. Megan agreed that as an alternative, it would be reasonable for Darla to fly between Brownsville and Houston for visitation and the extra cost could be a credit against David's child support. She testified that she did not have family in the Brownsville area and her relatives live in Liberty County. Megan agreed she could work in her current job from anywhere if she has high-speed internet, but she stated she had considerable problems getting high-speed internet when she previously lived in Liberty County.

Megan testified that she got behind on paying the note on the land (as ordered in the divorce decree) due to illness and being laid off and that "may have damaged [David's] credit." She agreed that after she and David divorced, she was in a relationship with "John" for several years, John put his mobile home on her property, and she and Darla lived with him in that home. She also testified that she knew her new husband Micah had a criminal history, and she agreed that he had either been incarcerated or possibly just arrested once, although she was uncertain about the details. Megan believed Micah had been charged with "something regarding theft."

Micah's Testimony

Micah is Megan's husband, and he testified that he works for Space X in the Brownsville area where he is "on call 24/7" and his salary is about $102,000 plus stock benefits. According to Micah, he has made several updates to the house he and Megan bought in Brownsville, and he believed Darla has benefited from the improvement to the house. Micah testified that he loves Darla like she is his own daughter, and sometimes he can go to events at Darla's school. Micah also testified that his relatives live in Rosharon, and if the court determined that Darla needed to live in Liberty County, he replied, "I guess it would split our family up." Micah agreed he had received deferred adjudication probation on a misdemeanor charge seventeen years earlier that was ultimately dismissed.

Holly's Testimony

Holly testified that she is eighteen years old and is David's cousin and adopted sister. According to Holly, she has witnessed David and Hannah argue a lot in front of Darla, she has seen David and Hannah slap each other, and when David got mad at Darla, he would whip her. She also testified that David had a "drinking problem[.]" On cross-examination, Holly was asked whether she had accused her biological father of molesting her, and Holly replied, "I was under the influence at the time when that happened." She also testified that her adoptive parents restricted the times she could see her boyfriend, which caused conflict.

<u>Millie's Testimony</u>

Millie, who is the grandmother of Megan's oldest child Cyrus, testified that she lives in Liberty County, and she thought David and Hannah had a "very close, a good relationship" with Darla and they tried to be as involved with Darla as possible.

<u>Hannah's Testimony</u>

David's new wife Hannah testified that she and Darla have "a great relationship[]" and they "cook together, we play games, we go out on different adventures, Sea World, elephant experiences." According to Hannah, "[a] lot has changed[]" since Darla moved to Brownsville, and their time together is "short now as far as any activities on the weekends." Hanna is concerned that Darla missed "quite a bit" of school time over the past school year due to a trip to Disney World with Megan. Hannah also testified that communication with Megan is difficult and became more difficult after Megan and Darla moved to Brownsville.

Hannah also testified that when David's cousin Holly does not get her way, "she lashes out and calls CPS or any other authority." Hannah testified that David drinks occasionally, but she stated she has never seen him drink and drive. According to Hannah, at one point Holly asked to live with her and David, but they said no "[b]ecause [Holly] causes a lot of problems[]" by lying and making false allegations.

## Issues

In her first issue, Megan argues that David did not show a substantial and material change in circumstances because there was no "historical comparison" or evidence of how Darla's relocation to Brownsville had materially and substantially changed David's ability to care for Darla or to participate in Darla's life. In her second issue, Megan argues that the evidence was insufficient to support a change in custody because David did not explain why it would be in Darla's best interest for David to have the exclusive right to determine Darla's residency and because "the record is void of the *Holley* factors." In her third issue, Megan argues that the trial court erred by changing conservatorship because a judgment must conform to the pleadings and evidence, and David only requested a judgment that ordered a geographical restriction to Liberty County—or in the alternative, that if Megan did not return to Liberty County, that David should be appointed the parent with the right to determine Darla's domicile. Megan asks this Court to vacate the modification order, or in the alternative, to reform the modification order restricting Darla's residence to Liberty County in accordance with David's testimony.

## Standard of Review

We review a trial court's decision in a case concerning a modification of conservatorship under an abuse of discretion standard. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). "The trial

court is given wide latitude in determining the best interests of a minor child." *Gillespie*, 644 S.W.2d at 451. Conservatorship determinations are "'intensely fact driven,'" and the trial court is in the best position to "'observe the demeanor and personalities of the witnesses and can "feel" the forces, powers, and influences that cannot be discerned by merely reading the record[.]'" *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (quoting *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002); *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.)). Therefore, we give the court great latitude in determining whether to believe a witness's testimony. *See In re Doe 4*, 19 S.W.3d 322, 325 (Tex. 2000). When the evidence is conflicting, we presume that the factfinder resolved the inconsistency in favor of the judgment if a reasonable person could do so. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We will reverse the trial court's judgment only when it appears from the record as a whole that the court has abused its discretion. *See In re J.J.R.S.*, 627 S.W.3d at 218 (citing *Gillespie*, 644 S.W.2d at 451). A trial court abuses its discretion when it acts arbitrarily or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985); *In re M.A.M.*, 346 S.W.3d 10, 13 (Tex. App.—Dallas 2011, pet. denied). "In determining whether a trial court abused its discretion, we view the evidence in the light most favorable to the trial court's decision and indulge every legal presumption in favor of the judgment." *See In re W.J.B.*, 294 S.W.3d 873, 878 (Tex. App.—

Beaumont 2009, no pet.) (citing *Royer v. Royer*, 98 S.W.3d 284, 285 (Tex. App.—

Beaumont 2003, no pet.)). We may not reverse for abuse of discretion simply

because we would have decided the matter differently. *Downer*, 701 S.W.2d at 242.

The court that has continuing exclusive jurisdiction may modify an order that

provides for the conservatorship, support, or possession of and access to a child. Tex.

Fam. Code Ann. § 155.003(a). Section 156.101 of the Family Code sets out the

grounds for modifying a conservatorship order:

> (a) The court may modify an order that provides for the appointment of
> a conservator of a child, that provides the terms and conditions of
> conservatorship, or that provides for the possession of or access to a
> child if modification would be in the best interest of the child and:
>
>> (1) The circumstances of the child, a conservator, or other party
>> affected by the order have materially and substantially changed
>> since the earlier of:
>>
>>> (A) the date of the rendition of the order; or
>>>
>>> (B) the date of the signing of a mediated or collaborative
>>> law settlement agreement on which the order is based[.]

*Id.* § 156.101(a)(1); *In re A.E.M.*, No. 09-18-00288-CV, 2020 Tex. App. LEXIS

1439, at *36 (Tex. App.—Beaumont Feb. 20, 2020, no pet.) (mem. op.). "'The

change-in-circumstances requirement is a threshold issue for the trial court and is

based on a policy of preventing constant re-litigation with respect to children.'" *In

re A.E.M.*, 2020 Tex. App. LEXIS 1439, at *36 (quoting *Smith v. Karanja*, 546

S.W.3d 734, 738 (Tex. App.—Houston [1st Dist.] 2018, no pet.)). Unlike

14

termination of parental rights cases in which the statutory grounds for termination must be established by clear and convincing evidence, the standard of proof for a conservatorship decision is preponderance of the evidence. *See In re J.A.J.*, 243 S.W.3d at 616. Circumstantial evidence is as probative as direct evidence. *See Cavanaugh v. Davis*, 235 S.W.2d 972, 977 (Tex. 1951) (citing *Duke v. Houston Oil Co. of Tex.*, 128 S.W.2d 480, 485 (Tex. App.—Beaumont 1939, writ dism'd, judgm't cor.)); *see also In re S.C.*, No. 09-21-00325-CV, 2022 Tex. App. LEXIS 2263, at *39 (Tex. App.—Beaumont Apr. 7, 2022, no pet.) (mem. op.) (explaining a best interest determination may rely on direct or circumstantial evidence); *In re K.P.*, No. 09-13-00404-CV, 2014 Tex. App. LEXIS 9263, at *42 (Tex. App.—Beaumont Aug. 21, 2014, no pet.) (mem. op.) (same). The party seeking modification bears the burden of demonstrating a material and substantial change in circumstances has occurred since the time of the previous order. *See In re R.A.*, No. 09-20-00275-CV, 2022 Tex. App. LEXIS 7575, at *17 (Tex. App.—Beaumont Oct. 13, 2022, no pet.) (mem. op.); *In re J.G.M.*, No. 09-11-00368-CV, 2012 Tex. App. LEXIS 4300, at *2 (Tex. App.—Beaumont May 31, 2012, no pet.) (mem. op.) (citing Tex. Fam. Code Ann. § 156.101; *Zeifman v. Michels*, 212 S.W.3d 582, 589 (Tex. App.—Austin 2006, pet. denied)).

In family law cases, the traditional sufficiency standard of review overlaps with the abuse of discretion standard; thus, legal and factual sufficiency are not

independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion. *Bradshaw v. Bradshaw*, 555 S.W.3d 539, 549 (Tex. 2018). We make a two-pronged inquiry: "(1) Did the trial court have sufficient information upon which to exercise its discretion; and (2) Did the trial court err in its application of discretion?" *Id.*; *see also In re R.H.C.*, No. 09-15-00429-CV, 2016 Tex. App. LEXIS 11388, at *12 (Tex. App.—Beaumont Oct. 20, 2016, no pet.) (mem. op.).

Section 156.101 of the Texas Family Code provides that a trial court may modify an order in a suit affecting the parent-child relationship when the circumstances of the child or conservators have materially and substantially changed since the date of the rendition of the prior order, and if modification would be in the best interest of the child. *See* Tex. Fam. Code Ann. § 156.101(a)(1)(A). "'In reviewing determinations regarding modifications of residency restrictions to permit a custodial parent's relocation, we look to the public policy the legislature has set forth in the family code for custody issues and the guidelines from that policy.'" *In re R.H.C.*, 2016 Tex. App. LEXIS 11388, at *13 (quoting *In re Cooper*, 333 S.W.3d 656, 660 (Tex. App.—Dallas 2009, orig. proceeding)); *see also Lenz*, 79 S.W.3d at 14. "Texas's public policy calls for frequent and continuing contact with parents when both parents are able to act in the child's best interest; providing the child with a safe, stable, nonviolent environment; and encouraging divorced parents to share in

the raising of the child." *Id.* (citing Tex. Fam. Code Ann. § 153.001; *Cooper*, 333 S.W.3d at 660).

Determination of a substantial and material change is not controlled by a set standard of criteria; instead, it is fact specific. *In re A.E.M.*, 2020 Tex. App. LEXIS 1439, at *37 (citing *Epps v. Deboise*, 537 S.W.3d 238, 243 (Tex. App.—Houston [1st Dist.] 2017, no pet.)). Some examples of material and substantial changes include (1) remarriage by a party, (2) poisoning of the child's mind by a party, (3) change in the home surroundings, (4) mistreatment of the child by a parent or step-parent, and (5) a parent's becoming an improper person to exercise custody. *Id.*

The child's best interest is the trial court's primary concern in determining issues of conservatorship, possession, and access. Tex. Fam. Code Ann. § 153.002. On appeal, we assess the trial court's best-interest finding by using the *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors include (1) the child's desires; (2) the child's current and future physical and emotional needs; (3) any physical or emotional danger to the child in the present or future; (4) the parental abilities of the individuals involved; (5) the programs available to those individuals to promote the child's best interest; (6) the plans for the child by these individuals; (7) the stability of the home; (8) acts or omissions by a parent tending to show that the existing parent-child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. *Id.*

The *Holley* factors are not exclusive, and in the conservatorship modification context, a court may consider other factors, such as the child's need for stability. *See In re A.E.M.*, 2020 Tex. App. LEXIS 1439, at **36-38. Because this modification involves residency restrictions and relocation, we also consider the factors identified by the Texas Supreme Court in *Lenz. See Lenz*, 79 S.W.3d at 14. In *Lenz*, the Court identified the following factors as being potentially relevant in determining the child's best interest as to a relocation: (1) the reasons for and against the move; (2) the relocation's effect on a child's education, health, and leisure opportunities; (3) accommodating any special needs or talents; (5) the effect on extended family relationships; (6) how the move will affect the noncustodial parent's visitation and communication with the child; and (7) the noncustodial parent's ability to relocate. *Id.* at 15-16; *In re R.H.C.*, 2016 Tex. App. LEXIS 11388, at **14-15.

Material and Substantial Change in Circumstances

When both parties allege in counter-petitions that there has been a material and substantial change in circumstances since the last order and both seek a modification of that order, the allegations constitute a judicial admission that there has been a material and substantial change in circumstances since the last order. *See In re A.E.M.*, 2020 Tex. App. LEXIS 1439, at *37; *see also In re A.E.A.*, 406 S.W.3d 404, 410 (Tex. App.—Fort Worth 2013, no pet.) ("One party's allegation of changed circumstances of the parties constitutes a judicial admission of the common element

18

of changed circumstances of the parties in the other party's similar pleading."). "'Admissions in trial pleadings are regarded as judicial admissions'" in the case and require no proof of the admitted fact, and "'authorize the introduction of no evidence to the contrary.'" *In re A.E.M.*, 2020 Tex. App. LEXIS 1439, at \*38 (quoting *In re L.C.L.*, 396 S.W.3d 712, 718 (Tex. App.—Dallas 2013, no pet.)). Accordingly, we conclude that the trial court could have reasonably found that there had been a material and substantial change in circumstances since the last order.

We overrule Appellant's first issue. Next, we determine whether a modification was in Darla's best interest.

Best Interest of the Child

In cases involving relocation, "no bright-line test can be formulated[,]" and because such lawsuits are intensely fact-driven, issues of the child's best interest are resolved on a case-by-case basis. *See Lenz*, 79 S.W.3d at 18-19. Upon consideration of the record, we conclude that the record includes sufficient evidence to support the trial court's determination that the modification was in Darla's best interest. *See id.*; *Holley*, 544 S.W.2d at 371-72.

Megan's move to Brownsville resulted in David having to make a six-and-a-half-hour drive to pick up and return Darla for visitation. Megan and David agreed to an alternative arrangement whereby Megan and David would meet halfway for a hand-off. David testified that since Megan moved to Brownsville with Darla, David

no longer can take her to school or pick her up, it limited or prevented his involvement with Darla's extra-curricular activities, and he could not visit Darla at school. David also testified that he had trouble getting Darla's records from her school in Brownsville because the school did not have a copy of the divorce decree, and he had to drive to Brownsville to deliver a copy of the decree and give the school his contact information. Megan testified that she had listed David as a contact with the Brownsville school, but she told the school if there was an emergency situation, the school should contact Megan. David also testified that he had not been listed as a contact with Darla's doctors, and he found out her doctor's name from prescription medicine Darla had. Megan testified that Darla missed a week of school to go on a trip to Disney World because David has possession of Darla for forty-five days during the summer, which meant Megan's family could not take a vacation during the summer and had to wait until September. Megan testified that she could work anywhere there is high-speed internet, and she also testified that she is pursuing a bachelor's degree through an online program. Both David's and Megan's extended families live in the Liberty County area, and Darla has no relatives in the Brownsville area except for Megan and Micah and their other children. Megan also testified that her extended family members live in the Liberty County area.

We consider the evidence in light of the factors articulated in *Holley* and *Lenz*. *See Lenz*, 79 S.W.3d at 14; *Holley*, 544 S.W.2d at 371-72. Deferring to the trial

court's assessment of the credibility and weight of the evidence, we conclude that the record includes sufficient evidence from which the trial court could have concluded by a preponderance of the evidence that a modification was in Darla's best interest. *See* Tex. Fam. Code Ann. § 156.101(a)(1); *In re B.C.C.*, No. 09-21-00001-CV, 2022 Tex. App. LEXIS 8785, at \*\*33-34 (Tex. App.—Beaumont Dec. 1, 2022, pet. dism'd) (mem. op.). The trial court could have considered the testimony that showed David was unable to be involved with Darla's schooling and her extra-curricular activities, the distance and time of travel, the location of family members, the lack of communication between David and Megan about Darla's medical providers and school, David's health problems from his injuries, as well as Megan's testimony that she can work from anywhere if she has access to the Internet. Applying the factors set forth in *Lenz*, the trial court could have concluded that Megan and Darla's relocation to Brownsville had an adverse effect on "the continuation of a meaningful relationship between the noncustodial parent and the child[.]" *See Lenz*, 79 S.W.3d at 15. The trial court could also have concluded that the communication issues between David and Megan related to "the parents' good faith in requesting or opposing the move[.]" *See id.*

Appellant argues that the trial court erred in its modification order because David failed to introduce any evidence showing why it would be in Darla's best interest to reside with him and because "[t]he record is void of the *Holley* factors."

The *Holley* factors are not exhaustive, and in *Lenz* the Texas Supreme Court addressed other considerations that are especially relevant when one parent has relocated. *See Lenz*, 79 S.W.3d at 14; *Holley*, 544 S.W.2d at 371-72.

The Final Order in the SAPCR states that the court found "it is in the best interest of the child to modify the Prior Order as herein provided." Because no party requested findings of fact and conclusions of law, we imply all necessary findings of fact to support the trial court's order. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *In re W.J.B.*, 294 S.W.3d at 878.

We are mindful that we may not reverse under an abuse-of-discretion standard simply because we might have decided the matter differently. *See Downer*, 701 S.W.2d at 242. We defer to the trial court's role as factfinder to determine the weight and credibility of the evidence, to believe or disbelieve the witnesses, and to resolve inconsistencies in the testimony. *See City of Keller*, 168 S.W.3d at 832. On this record, even if we might have reached a different conclusion, we cannot say that the trial court's decision is outside the zone of reasonable disagreement. *See id.* at 822. We overrule Appellant's second issue.

Sufficiency of the Pleadings

In her third issue, Appellant argues that the trial court's final order was not supported by the pleadings or the evidence. More specifically, Appellant argues that "[e]ntering a judgment granting Father the exclusive right to determine the child's

22

residency was error because the trial record is void of such request." In our analysis of Appellant's first and second issues, we have already concluded that the evidence and testimony was sufficient to support the trial court's order.

In his Request for Emergency Hearing, Second Amended Counter Petition to Modify a Prior Order, the live pleading at the time of trial, David pleaded in relevant part,[3]

> [David] requests that the Court modify the prior order and impose a geographic restriction on the residence of the child, and name [David] as the conservator with equal periods of possession and *with the exclusive right to establish the residence of the child*.

Therefore, we conclude that the trial court's final order conformed to the live pleading at the time of trial. *See Stoner v. Thompson*, 578 S.W.2d 679, 682-83 (Tex. 1979) (explaining that "judgment must be based upon pleadings[]"). We overrule Appellant's third issue. Having overruled all of Appellant's issues, we affirm the trial court's final order ("Modification Order in a Suit Affecting the Parent-Child Relationship").

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on June 22, 2023
Opinion Delivered August 3, 2023

Before Horton, Johnson & Wright, JJ.

_____

[3] Emphasis added.

23